## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS


**RHONDA ZARZECKI,**
**Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL**
**SECURITY,**
**Defendant.**                                    **No. 09 - CV - 01080 DRH**


## MEMORANDUM AND ORDER


**HERNDON, Chief Judge:**

### I. Introduction

Plaintiff Rhonda Zarzecki applied for a period of disability and disability

insurance benefits on January 11, 2007 (Tr. 14). The Social Security Administration

denied the application initially and again upon reconsideration. Plaintiff filed a timely

written request for a hearing before an administrative law judge ("ALJ"), and the

hearing was held on January 7, 2009. By decision dated March 27, 2009, the ALJ

found that plaintiff was not entitled to disability insurance benefits because she was

not disabled as defined in the Social Security Act at any time beginning on or before

December 31, 2005 (Tr. 20). Plaintiff's request for review by the Appeals Council was

denied on October 27, 2009 (Tr. 1). Thus, the ALJ's decision became the final

decision of the Commissioner. 20 C.F.R. § 416.1481; *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Plaintiff now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g). Plaintiff also seeks reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d). For the reasons set forth below, plaintiff's complaint is **DENIED** with prejudice.

## II. <u>Background</u>

Plaintiff Rhonda Zarzecki was born on September 20, 1966 (Tr. 14). She is a high-school graduate and married mother of three children (Tr. 26, 33). At the time of the hearing before the ALJ, plaintiff was 42 years old (Tr. 25). When she applied for disability insurance benefits and supplemental security income on January 11, 2007, plaintiff asserted that her disability commenced on July 28, 2002 (Tr. 14). But at the hearing before the ALJ, plaintiff amended the date of her alleged onset of disability to August 22, 2005 (Tr. 60).

Plaintiff lists fibromyalgia, depression, neck and leg pain, bladder problems, irritable bowel syndrome, and frequent migraines as her disabilities (Tr. 154). She claims that her illnesses and injuries prevented her from returning to work on July 28, 2002. Plaintiff's most significant work history is from 1990–99 when she worked as a dental assistant (Tr. 155). Her other experience includes work as a retail clerk, nanny, and front-desk receptionist. Plaintiff was last insured on December 31, 2005 (Tr. 14).

*A. Medical Records Prior to Plaintiff's Date Last Insured*

On September 9, 1998, plaintiff saw Dr. Henry E. Mattis, a cardiologist, for chest pain and palpitations (Tr. 233). He diagnosed her with mitral valve prolapse; however, the condition remained untreated until 2002 when he prescribed Atenolol, a beta blocker.

Plaintiff saw Dr. Mattis again on July 22, 2002, for complaints of left-arm numbness and left-upper-chest discomfort, described as "heaviness" (Tr. 233). She complained that she had heart palpitations the previous Saturday and Sunday and was having shortness of breath and a noted cough. At that time plaintiff was supposed to have been taking 50mg of Atenolol in the morning and another 25mg in the evening, but she was only taking 25mg twice per day. Plaintiff's last stress test was performed in 1998, and it was "clinically and electrocardiographically negative for ischemia" (Tr. 233). An echocardiogram completed on February 1, 2002, was normal except for mitral valve prolapse. Dr. Mattis increased her Atenolol to 50mg in the morning and 25mg in the afternoon, and put her on a Holter monitor to track her heart rate (Tr. 233).

On July 27, 2002, plaintiff was admitted to the hospital for palpitations, chest pain, and arm numbness (Tr. 252). At that time she was still taking Atenolol for her mitral valve prolapse and Wellbutrin for depression. She reported that the Wellbutrin caused her to have heart palpitations. Dr. Prasad Kandula recommended that plaintiff have a cardiac catheterization, which she later refused. Dr. Panduranga Kini performed an MRI of the head and neck and did not find anything abnormal in the

MRI of the brain. She was discharged two days later and told to stay on her current medications and to follow up with Drs. Mattis and Kini in two weeks (Tr. 252).

On August 14, 2002, plaintiff saw Dr. Kini for a follow-up visit (Tr. 262). She presented with stiffness in her leg and tightness in her hands. She complained of feeling fatigued and tired all the time, and stated that she had felt this way since a young age. Plaintiff complained that her fatigue had gotten worse since her father died a few years ago. Dr. Kini noted that plaintiff "feels as if she is having fibromyalgia" (Tr. 262). Dr. Kini contemplated switching plaintiff to Corguard because of her fatigue and tiredness, but Dr. Mattis later instructed plaintiff to remain on Atenolol because Corguard would make her more drowsy (Tr. 262, 239).

On October 22, 2004, plaintiff first saw Dr. Hageman for complaints of dysuria, frequent urination, irritable bowel syndrome, fibromyalgia, and mitral valve prolapse (Tr. 274). He noted a history of mitral valve prolapse, irritable bowel syndrome, fibromyalgia, and other conditions.

On April 22, 2005, plaintiff saw Dr. Hageman again for treatment of stomach pain, poor appetite, and dark stools (Tr. 273). Dr. Hageman diagnosed her with gastritis, irritable bowel syndrome, and fibromyalgia and prescribed Bentyl, Citricil, and Prevacid.

On August 22, 2005, plaintiff returned to Dr. Hageman for treatment of depression symptoms, including insomnia, moodiness, and lack of appetite (Tr. 272). Dr. Hageman noted she had been treated for depression before. He prescribed Zoloft. Plaintiff saw Dr. Hageman again on December 21 for symptoms related to

sinusitis. The medical records note a diagnosis of sinusitis and depression. Sudafed and Lexapro were prescribed (Tr. 271).

*B. Medical Records After the Date Last Insured*

On February 3, 2006, plaintiff saw Dr. Edward Rose, a rheumatologist, with symptoms of joint pain, bladder problems, irritable bowel syndrome, mitral valve prolapse, and insomnia (Tr. 304). Dr. Rose noted that plaintiff's mother has fibromyalgia. His examination of plaintiff was normal, except for tenderness in all points tested. Dr. Rose commented, "Mrs. Zorzecki [*sic*] thinks she has fibromyalgia, and I suspect she is correct. . . . She seems quite cooperative and knowledgeable about this diagnosis and may be a good candidate for Provigil, which is said to help the fatigue part of this disease" (Tr. 304).

On March 3, 2006, plaintiff had a follow-up with Dr. Mattis (Tr. 236). The medical records note that plaintiff had a history of mitral valve prolapse, atypical chest pain, and palpitations. Dr. Mattis further noted that plaintiff had a remarkable history of fibromyalgia and her muscle aches and pains were relieved by Ultracet. "She has done well over the past couple of years from a cardiac standpoint. She gets occasional palpitation and takes low dose beta blocker for a week or so and the [*sic*] is off of it" (Tr. 236). Dr. Mattis noted that he would continue her current medical regimen and see her for a follow-up in one year.

On May 23, 2006, plaintiff saw Dr. Murray D. McGrady for severe recurrent headaches, photophobia, nausea, and vomiting (Tr. 289). She complained that the

headaches caused her to stay in bed all day, and the symptoms subsided within one or two days. Plaintiff had not had a headache in six weeks. She commented that she had a history of migraines. Dr. McGrady prescribed Imitrex for the headaches and told plaintiff he would refer her to a neurologist if the Imitrex did not ease her headaches.

On September 17, 2007, plaintiff saw Dr. Julius Clyne, a psychiatrist, for symptoms of depression (Tr. 374). The medical records indicate that plaintiff was taking Cymbalta, Ultracet, Lorzapam, and iron supplement. Dr. Clyne noted that plaintiff had been diagnosed with fibromyalgia in 2002 and had a history of mitral valve prolapse. Then on September 28 plaintiff visited Dr. Clyne again (Tr. 372). He diagnosed her with major depression and prescribed Cymbalta and Ativan.

Plaintiff returned to Dr. Clyne on January 17, 2008 (Tr. 387). He noted that she had not been taking Ultracet and was taken off her antidepressant medication. The following day Dr. Clyne prepared a medical source statement of plaintiff's mental ability to do work-related activities (Tr. 378–80). He rated her "fair" or "poor to none" in all areas of mental occupational, performance, and personal-social adjustments. He attributed these findings to fibromyalgia and major depression. Plaintiff saw Dr. Clyne for follow-up appointments on May 11 and July 8, 2008 (Tr. 385–86). Dr. Clyne noted that she was taking her prescribed medications and was not suicidal. Dr. Clyne renewed his medical source statement on July 8 and again on December 23, 2008 (Tr. 382, 412).

*C. The ALJ Hearing*

Plaintiff appeared for a hearing before ALJ Edward Pitts on January 7, 2009. She was represented by attorney Scott W. Dixon. Vocational expert Dr. John F. McGowan testified by telephone (Tr. 3).

The ALJ explained to plaintiff that because she was last insured at the end of December 2005 he would only consider medical conditions and medical treatment that occurred before that time (Tr. 34). Plaintiff then testified that she had sought treatment in 2002 from cardiologist Dr. Henry Mattis for mitral valve prolapse (Tr. 34). She testified that she was given Atenolol for treatment of the condition and did not require surgery or a beta blocker. When asked whether she had suffered any side effects from taking Atenolol, plaintiff stated that it made her drowsy but that she tolerated the medication "fine."

Plaintiff testified that she began seeing Dr. Matthew Hageman, her primary doctor, in October 2004 (Tr. 36). At first, she saw Dr. Hageman for treatment of her cold symptoms. Between 2004–05 he began to treat her for irritable bowel syndrome. Plaintiff stated that she had suffered from symptoms of irritable bowel syndrome for years, e.g., nausea, stomach pain, bloating, and diarrhea, but she did not know what was causing the symptoms (Tr. 37–38). Plaintiff said her symptoms progressively became worse between 2004–05 (Tr. 38). At one point her symptoms were so severe that she saw a stomach specialist and underwent a colonoscopy (Tr. 37, 39). Plaintiff testified that some days she had to remain close to a restroom at all times (Tr. 39).

Plaintiff said she had been suffering from headaches since 1994 (Tr. 40). The

ALJ acknowledged that he was in possession of post-2005 medical records pertaining to headaches, but asked plaintiff to recall the severity of her headaches prior to 2005. When asked if she suffered from common migraine symptoms, such as being confined in a room and not being able to do anything for an entire day, plaintiff answered affirmatively (Tr. 39, 40). She testified that in 2005 she suffered from migraines several times per month (Tr. 41).

Plaintiff said she first sought treatment for depression in 1996 (Tr. 42). In August 2005 Dr. Hageman prescribed Zoloft for her. But she only took the Zoloft for two-and-a-half or three weeks because it made her very drowsy and unable to get out of bed (Tr. 43). Thus she then began to use an unknown medication to treat her depression symptoms.

At the end of 2005, Dr. Hageman referred plaintiff to Dr. Rose so that she could be tested for fibromyalgia (Tr. 44). Plaintiff testified that after the second visit with Dr. Rose he prescribed Ultracet for her fibromyalgia. She reported that Ultracet "helps a lot" with her symptoms (Tr. 45).

Plaintiff began to testify about her arthritis symptoms, but the ALJ commented that the medical records pertaining to her arthritis post-date 2005 (Tr. 46). At that time, all discussion of plaintiff's arthritis ceased.

Plaintiff's attorney then directed the ALJ's attention to plaintiff's current migraine symptoms (Tr. 46, 47). Plaintiff stated that it is typical for her to stay in bed until 1:00 p.m. (Tr. 49). The ALJ questioned her about her recent treatment with Dr. Julius Clyne, the psychiatrist. Plaintiff testified that Dr. Clyne had been treating her

for anxiety and depression (Tr. 47). She stated that she suffered from weekly crying spells that were just as severe then as when Dr. Hageman saw her in 2005. She also stated that medication had helped with the severity of her symptoms, and she was suffering from the crying spells once or twice a month (Tr. 48). She testified that at times she became depressed, felt like a bad mother, and would cry.

When asked why she could not return to any of her previous jobs in 2005, plaintiff testified that her symptoms prevented her from sitting and standing for long periods of time and that she regularly suffered from hip pain, drowsiness, and unhappiness (Tr. 49–50). She stated that she was unable to do recreational activities such as going to the zoo or on vacation (Tr. 50).

Dr. McGowan, a vocational expert, also testified at the hearing (Tr. 51). Dr. McGowan did not ask any questions of plaintiff; rather, he discussed the specific vocational preparation of plaintiff's previous positions as a retail sales clerk, receptionist, nanny, and dental assistant (Tr. 51–53). The ALJ asked Dr. McGowan to consider a hypothetical 42-year old with a high-school diploma and the same work experience and limitations as plaintiff (Tr. 54). Dr. McGowan testified that such a person may be able to perform plaintiff's past position as a front-desk attendant, but he expressed some concern because that position entails dealing with the public, which may not be low stress. Dr. McGowan opined that other assembly-type jobs or a position as a mail clerk might be appropriate for someone with plaintiff's background, experience, and limitations (Tr. 55–56). Plaintiff's attorney then asked whether Dr. McGowan's opinion would differ if the ALJ were to find plaintiff's

complaints credible regarding her depression, migraine headaches, and limitations due to the side effects of her medications (Tr. 57). Dr. McGowan testified that if plaintiff would have had to miss work as often as twice per week some weeks or up to four days per month because of her severe depression, frequent headaches, or other medical impairments, she would have been unemployable (Tr. 58).

After a discussion with her attorney, plaintiff amended her date of disability to August 22, 2005 (Tr. 58–60).


## D. The ALJ's Decision

The ALJ rendered a decision denying benefits on March 27, 2009 (Tr. 14–20). In his decision, the ALJ determined that: (1) plaintiff met the special earnings requirement of the Act as of August 22, 2005, the alleged onset of disability, and continued to meet them through December 31, 2005, but not thereafter; (2) plaintiff had not engaged in substantial gainful activity since August 22, 2005; (3) plaintiff had several medically determinable impairments through December 31, 2005, namely mitral valve prolapse, depression controlled by medication, and possible early-onset irritable bowel syndrome and/or fibromyalgia; (4) allegations made by plaintiff, her husband, and sister of impairments producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity for a continuous period of at least twelve months beginning on or before December 31, 2005, were not credible; (5) through December 31, 2005, plaintiff had only slight abnormalities that did not significantly affect the performance of any basic work-

related activities, and therefore she did not have a severe impairment as defined in 20 C.F.R. § 404.1521; and (6) plaintiff was not under a "disability" as defined by the Act at any time beginning on or before December 31, 2005 (Tr. 19–20).

In reaching this decision, the ALJ weighed the medical records in evidence, plaintiff's testimony, and the written statements of plaintiff's husband and sister (Tr. 17–21). The ALJ afforded little weight to plaintiff's allegations of physical impairments, noting that no doctor who treated plaintiff prior to 2006 "stated or implied that she was disabled or totally or seriously incapacitated" (Tr. 17). The ALJ remarked that plaintiff had not exhibited most of the signs typically associated with chronic, severe musculoskeletal pain, such as: muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits (motor, sensory, or reflex loss) or other signs of nerve-root impingement, significantly abnormal x-rays or other diagnostic tests, positive straight-leg raising, inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction (Tr. 18). No doctor had placed plaintiff on specific long-term limitations on her ability to stand, sit, walk, bend, lift, carry, or perform other basic exertional activities (Tr. 17). To the extent that plaintiff's activities were restricted, the ALJ concluded that they were restricted only by her personal choice and not by a physician's directive (Tr. 18). Plaintiff had never had regular medical attention or treatment, only treatment for acute medical problems or alleged symptoms as they arose (Tr. 17). Nor were there any documented surgeries or in-patient hospitalizations, other than the one in 2002, that led to any long-term limitations or

complications. The ALJ commented, "[w]hatever adverse side effects the claimant had at various times were in all instances eliminated or at least greatly diminished by simple changes in either the type of medication or the size and/or frequencies of dosages" (Tr. 18).

The ALJ concluded that before 2006 there was no evidence that plaintiff had a mental impairment or combination of mental impairments that met or medically equaled one of the listed mental impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 18). The ALJ noted that plaintiff's ability to think, understand, communicate, concentrate, get along with other people, and handle normal work stress were never significantly impaired for any long-term basis. There was no documented serious deterioration in her personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns (Tr. 18). Additionally, plaintiff had never been referred for formal treatment to a psychiatrist, psychologist, or other mental-health professional before December 31, 2005 (Tr. 18).

The ALJ considered written statements from plaintiff's husband and sister, dated 2007, about plaintiff's alleged symptoms and physical limitations (Tr. 18). Yet "to the extent that they can be interpreted as commenting on the claimant's medical condition before 2006," he concluded they were inconsistent with the preponderance of medical evidence and were not credible. Thus because there was no credible evidence of plaintiff having even a moderate inability to perform mental activities of

daily living or of maintaining social functioning, the ALJ concluded that plaintiff did

not have mental limitations in her ability to do basic work activities (Tr. 18–19).


### III. <u>Discussion</u>

*A. Social Security Guidelines*

To receive disability benefits, a plaintiff must be disabled. A disabled person

is one whose physical or mental impairments result from anatomical, physiological,

or psychological abnormalities that can be demonstrated by medically acceptable

clinical and laboratory diagnostic techniques and that prevent the person from

performing previous work and any other kind of substantial gainful work existing in

the national economy. 42 U.S.C. §§ 423(d)(1)(A) & (2)(A), 1382c(a)(3)(B) & (D).

The Social Security regulations provide for a five-step sequential inquiry for

determining whether a plaintiff is disabled. 20 C.F.R. §§ 404.1520, 416.920. The

Commissioner must consider in sequence: (1) whether the plaintiff is currently

employed and doing substantial gainful activity, (2) whether the plaintiff has a severe

medically determinable physical or mental impairment or combination of

impairments, (3) whether the impairment meets or equals one listed by the

Commissioner, and whether it meets the duration requirement, (4) whether the

plaintiff has the residual functional capacity to return to doing his or her past work,

and (5) whether the plaintiff is capable of making an adjustment to some other type

of work available in the national economy. *Id*.

If the Commissioner finds that the plaintiff is disabled or not disabled at any step, the evaluation process stops. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or five, then there is a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. However, if the impairment is not so listed, the Commissioner assesses the plaintiff's residual functional capacity, which in turn is used to determine whether the plaintiff can perform past work under step four or any other work in society under step five. § 404.1520(e). The plaintiff bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor*, 425 F.3d at 352.

B. *Standard of Review*

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." An ALJ need not address every objective finding in the record for his judgment to be supported by substantial evidence; the ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart,*

309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). Further, the Seventh Circuit urges "a commonsensical reading" of a plaintiff's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). Nevertheless, an ALJ's decision "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004).

The deferential substantial-evidence standard applies, *inter alia*, to findings regarding credibility. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were 'patently wrong.'" (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000))).

The court will consider the entire administrative record but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Lopez ex. rel. Lopez*, 336 F.3d at 539 (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

## IV. Analysis

The issues presented are (1) whether the ALJ improperly rejected Dr. Julius Clyne's source statement that post-dated plaintiff's date last insured; (2) whether the ALJ erred in finding plaintiff's statements not credible because he insufficiently analyzed the side effects of medication; and (3) whether the ALJ's determination that

plaintiff did not suffer from a severe mental and physical impairment was based on substantial evidence.

*A. January 2008 Source Statement from Dr. Clyne*

Plaintiff argues that the ALJ improperly rejected Dr. Julius Clyne's January 18, 2008, source statement, even though it was made well after plaintiff's date last insured. Dr. Clyne's statement rated plaintiff's mental ability to do work-related activities (Tr. 378–80). He rated her "fair" or "poor to none" in all areas of mental occupational, performance, and personal-social adjustments, attributing these limitations to her fibromyalgia and major depression. First, plaintiff argues that the ALJ "improperly assumed" that Dr. Clyne's findings in the source statement could not relate to the time period prior to December 31, 2005, even though her underlying conditions of depression and fibromyalgia had been diagnosed during that time. Second, plaintiff argues that the ALJ should have sought additional information about the time period to which Dr. Clyne's opinions applied. And third, plaintiff argues that the ALJ failed to follow applicable regulations for weighing the medical opinions of treating physicians.

While the ALJ considered Dr. Clyne's 2008 source statement, he emphasized that it was not relevant to any time period before September 2007, when plaintiff first saw Dr. Clyne. In coming to that conclusion, the ALJ reviewed the medical records and observed that plaintiff's depression was noted as far back as 2002, but that only medication was prescribed for it. No physician referred plaintiff for formal treatment

to a psychiatrist, psychologist, or other mental-health professional. And plaintiff had never required psychiatric hospitalization or similar intervention. Finally, plaintiff's first consultation with a psychiatrist came almost two years after her date last insured. Thus even though Dr. Clyne diagnosed plaintiff with major depression, there was no indication that her symptoms were as severe at any time earlier. So it was not an improper assumption to discount the source statement. The ALJ reviewed the evidence in the record and found that the source statement was not relevant.

Second, plaintiff argues that if the ALJ required clarification about the time period to which Dr. Clyne's opinions applied, he should have sought out Dr. Clyne and asked him (Doc. 19, p. 13). Plaintiff says the ALJ has a "duty to investigate the facts," citing *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000). But there is no suggestion that Dr. Clyne intended his source statement to apply to plaintiff's condition at any earlier time. The evidence was not inadequate, so the ALJ was under no obligation to contact Dr. Clyne regarding the scope of his opinion. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the plaintiff is disabled.") (citing 20 C.F.R. § 404.1512(e)). Based on the evidence, the Court finds that the ALJ reasonably concluded that Dr. Clyne's 2008 source statement was not corroborated by contemporaneous objective medical evidence concerning plaintiff's mental health before her date last insured. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (it was not error for the ALJ to discount medical evidence post-dating the date last insured).

Plaintiff also argues that the ALJ erred by not following applicable regulations when he assessed the weight to be given to Dr. Clyne's medical opinion (Doc. 19, p. 14). For instance, an examining source generally receives more weight than a nonexamining source, 20 C.F.R. § 404.1527(d)(1); a source who has treated the patient generally receives more weight than do reports from individual examinations, § 404.1527(d)(2); and additional weight is generally given if the source has treated the patient for a longer period of time and more times, § 404.1527(d)(2)(i). The Seventh Circuit has stated that "[a] treating physician's opinion is entitled to 'controlling weight' if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)). So when an ALJ discounts the opinion of a treating physician, he must articulate good reasons for doing so. *Luster v. Astrue*, 358 Fed. App'x 738, 740 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, Dr. Clyne was a treating physician. Nevertheless the ALJ provided good reasons for discounting his medical opinion. The ALJ explained that he would only consider medical conditions that had occurred before the end of December 2005 (Tr. 34). As previously stated, the ALJ noted that plaintiff had not been referred to a psychiatrist nor consulted one herself until September 2007. She had never required any psychiatric hospitalization. He also remarked that Dr. Clyne completed the mental residual functional capacity assessment form after noticing that plaintiff had not been taking her pain medication. By a few months later, however, plaintiff was

taking her medication again and demonstrated a "much more stable mental status." Based upon the evidence, the Court finds that the ALJ's decision to discount Dr. Clyne's 2008 medical assessment is supported by substantial evidence. The ALJ need only build a bridge from the evidence to his conclusion, and he has done so.

## B. Credibility Assessment

Plaintiff argues that the ALJ erred in finding that plaintiff's statements were not entirely credible because he insufficiently analyzed the side effects of plaintiff's medications (Doc. 19, p. 14). In assessing credibility, the ALJ must consider the objective medical evidence plus the seven factors identified in 20 C.F.R. § 404.1529(c)(3), including plaintiff's daily activities, the characteristics of her symptoms, and the effects of any medications she is on. *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); SSR 96-7p. The ALJ also must consider any inconsistencies in the record. § 404.1529(c)(4).

As stated above, the Court evaluates the ALJ's credibility findings under a highly deferential standard. *Zurawski*, 245 F.3d at 887. This Court will only set them aside if they are patently wrong. *Id.* A court should conclude that a credibility determination is patently wrong only when it "lacks explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Plaintiff points to her hearing testimony where she testified that Atenolol and Zoloft made her drowsy. She contends that the ALJ briefly mentioned a side effect from a medication for mitral valve prolapse in 2002 but otherwise did not analyze

the issue. The Court disagrees. The ALJ's decision demonstrates that he considered the side effects of medications, among the other factors he weighed in the credibility findings. Specifically, the ALJ commented, "[t]here is no documented record of any significant, uncontrollable adverse side effects from medications the plaintiff took. Whatever adverse side effects the plaintiff had at various times were in all instances eliminated or at least greatly diminished by simple changes in either the type of medication or the size and/or frequencies of the dosages" (Tr. 17–18).

The ALJ also analyzed plaintiff's daily activities and noted that no doctor had placed her on specific long-term limitations on her ability to stand, sit, walk, bend, lift, carry, or perform other basic exertional activities. To the extent plaintiff's activities were limited, the ALJ concluded it was only by personal choice, not by physician's directive. In addition, the ALJ considered written statements from plaintiff's husband and sister, dated 2007, about her alleged symptoms and physical limitations. But he found them inconsistent with the preponderance of the medical evidence, "to the extent that they can be interpreted as commenting on the [plaintiff's] medical condition before 2006, . . ." (Tr. 18).

Considering the highly deferential standard by which the Court is to review the credibility findings, the Court finds the ALJ's explanation of the medical records and other factors related to the side effects of plaintiff's medication was adequate to support his credibility finding.

*C. ALJ's Evaluation of Plaintiff's Mental and Physical Condition*

Plaintiff contends that the ALJ did not have substantial evidence for his conclusion that her mental and physical impairments, namely her depression, headaches, fatigue, and fibromyalgia were not severe. She argues that each of these conditions was well documented before December 31, 2005, and therefore the ALJ should have found that they were severe impairments.

An impairment or combination of impairments is severe if it significantly limits a plaintiff's physical or mental disability to do basic work activities. 20 C.F.R. § 404.1521; SSR 85-28; *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). Basic work activities are defined as the "abilities and aptitudes necessary to do most jobs." § 404.1521(b). Examples include: walking, standing, sitting, lifting; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; and responding appropriately to supervision and usual work situations. § 404.1521(b). On the other hand, an impairment or combination of impairments is not severe when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . ." SSR 85-28.

As to her mental condition, plaintiff cites various notations in her records from July 2002 through December 2005 diagnosing depression and prescribing Zoloft, Wellbutrin, and Paxil (Doc. 19, pp. 16–17). She reargues that Dr. Clyne's source statement documents her limitations. She had also testified to having all-day crying spells once or twice per month. Indeed the ALJ agreed that plaintiff suffered from

depression, but he determined that it was only a "slight abnormality not significantly limiting the performance of any basic work activities" (Tr. 17). Plaintiff had not sought out psychological or psychiatric health treatment until seeing Dr. Clyne in 2007. She had no history of hospitalizations or out-patient treatment for mental-health problems. She had no restrictions of mental activities of daily living or of maintaining social functioning. And she had no recorded or credible instances of deficiencies of concentration, persistence, or pace resulting in her failure to complete tasks in a timely manner in work settings or elsewhere (Tr. 17, 18). Thus there was no indication in records before 2006 that her depression was severe enough to significantly limit her physical or mental disability to do basic work activities. The Court finds that the ALJ's determination regarding plaintiff's mental impairments is supported by substantial evidence.

As to her physical condition, plaintiff argues that the ALJ erred in determining that her headaches, fatigue, and fibromyalgia were not severe medical impairments. She relies on medical records in 2002, 2004, and 2005 that demonstrate she suffered from symptoms related to fibromyalgia, fatigue, and headaches. And there was hearing testimony that headaches would limit her ability to function on a daily basis. The ALJ reviewed plaintiff's medical records and noted that none of the doctors who treated plaintiff before 2006 had stated or implied that she was disabled or incapacitated. He remarked that "no doctor placed any specific long-term limitations on the plaintiff's abilities to stand, sit, walk, carry, or do other basic exertional activities." Nor was plaintiff ever referred "for physical therapy or to any

pain clinic or pain disorders specialist for treatment." The Court finds therefore that the ALJ's determination that plaintiff had no severe medically determinable impairment or combination of impairments before her date last insured is supported by substantial evidence.

## V. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision, concluding that plaintiff Rhonda Zarzecki was not disabled, is supported by substantial evidence on the record as a whole. Plaintiff's complaint (Doc. 3) is therefore **DENIED** with prejudice. The Agency's decision is affirmed and judgment will be entered for the defendant.

**IT IS SO ORDERED.**

Signed this 1st day of April, 2011.

Digitally signed by
David R. Herndon
Date: 2011.04.01
13:28:12 -05'00'

**Chief Judge**
**United States District Court**